Brooks E. Harlow, Esq. (WSBA No. 11843)
LUKAS, NACE, GUTIERREZ & SACHS, LLP
8300 Greensboro Drive, Ste. 1200
McLean, VA 22102
Tel. 705-584-8678
Fax. (703) 584-8694
*Counsel for Plaintiffs*, Venezia, *et al.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SEAN VENEZIA, MICHAEL S. HARVEY, GREGORY LUDVIGSEN, ARTHUR HULL, and ALAN ROCKWELL, individually and on behalf of a class of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>*v.*<br><br>FERRELLGAS PARTNERS, L.P., a limited partnership; FERRELLGAS, L.P., a limited partnership d/b/a Blue Rhino; AMERIGAS PARTNERS, L.P., a limited partnership, and AMERIGAS PROPANE, L.P., a limited partnership d/b/a AmeriGas Cylinder Exchange, and AMERIGAS PROPANE, INC., a corporation,<br><br>     *Defendants*. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**(INDIRECT PURCHASERS)**<br><br>**JURY TRIAL DEMAND** |

Plaintiffs, SEAN VENEZIA, MICHAEL S. HARVEY, GREGORY LUDVIGSEN, ARTHUR HULL, and ALAN ROCKWELL, individually and on behalf of a class of all others similarly situated, sue defendants, FERRELLGAS PARTNERS, L.P and FERRELLGAS, L.P. (d/b/a Blue Rhino) (collectively, "Blue Rhino") and AMERIGAS PARTNERS, L.P., AMERIGAS PROPANE, L.P. d/b/a AmeriGas Cylinder Exchange, and AMERIGAS PROPANE, INC., (collectively, "AmeriGas"), and allege as follows:

# I.     NATURE OF THE ACTION

1.     At all times material hereto defendants were the two largest suppliers in the United States of standardized, prefilled portable steel tanks, commonly referred to as "propane exchange tanks," to retail outlets, including home improvement stores, hardware stores, mass merchandisers, supermarkets, convenience stores and gas stations. Retailers, in turn, make the tanks available for exchange to consumers in the United States. Propane exchange tanks are used, among other things, for barbeque grills, outdoor patio heaters, outdoor fireplaces, recreational vehicles, and mosquito traps.

2.     In 2008, Blue Rhino and AmeriGas raised the price of propane sold in propane exchange tanks by reducing the amount of propane filled in those tanks by approximately 13%, from 17 pounds to 15 pounds, while charging the same wholesale price per propane exchange tank. The 13% reduction in the fill levels with no corresponding reduction in price was and is economically equivalent to a price increase of approximately 13%.

3.     The wholesale market for propane exchange tanks is not regulated and retailers are free to switch suppliers if a supplier decides to increase wholesale prices. Defendants were not able unilaterally to increase their wholesale price for propane exchange tanks, because a unilateral price increase of that magnitude is not feasible in an unregulated market without a corresponding loss of volume and profits. To force their customers to accept the price increase, Blue Rhino and AmeriGas both had to introduce the price increase thereby preventing customers from defecting to the lower-priced supplier. The Defendants had to conspire, agree and coordinate the new fill levels. The price increase was the object of a conspiracy between the defendants in violation of Section 1 of the Sherman Act and analogous state antitrust laws.

4.      Defendants' concerted price increase took effect in or about August 2008 and continues to the present (the "violation period"). During the violation period, retailers did not lower the retail price of propane exchange tanks they charged to consumers, thereby entirely passing on to plaintiffs and members of the class the price increase for the propane contents of the tank.

5.      Defendants' conduct has restrained price competition and led to higher prices for propane sold in propane exchange tanks in the United States. As a result of defendants' conduct, purchasers of propane exchange tanks in the United States, including plaintiffs, paid a higher price per pound for propane sold in propane exchange tanks than they otherwise would have paid but for the defendants' unlawful conspiracy and concerted conduct.

6.      Plaintiffs are indirect purchasers who exchanged AmeriGas and/or Blue Rhino propane tanks during the violation period. Plaintiffs bring this action individually and on behalf the putative class of similarly situated consumers for injunctive relief and to recover damages to compensate for the injury sustained by plaintiffs and proposed class as a result of defendants' unlawful concerted price fixing conduct.

7.      The United States Federal Trade Commission ("FTC") has initiated an administrative action to enjoin defendants from engaging in their illegal conspiracy. The action is pending and currently set for hearing in Washington, D.C. in December 2014.

## II.      JURISDICTION AND VENUE

8.      This is an action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 for equitable relief, costs of suit, and reasonable attorneys' fees for defendants' violation of and conspiracy to violate Section 1 of the Sherman Act, 15 U.S.C § 1 and pursuant to California Bus. & Prof. Code § 16700 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq.*, as well as the antitrust, unfair competition and/or consumer protection laws of the "Indirect Purchaser

States," as that term is defined below.

9.     This court has original subject-matter jurisdiction over this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337, 2201, and 2202. The court also has original subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6). The matter in controversy in this action exceeds the sum or value of $5,000,000., exclusive of interest and costs, and is a class action in which a member of the class of plaintiffs is a citizen of a State different from one or both defendants.

10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391. Defendants conduct business and are found in this judicial district.  In addition, plaintiff, SEAN VENEZIA, and unnamed class members purchased propane in propane exchange tanks from retailers supplied by defendants throughout the Northern District of California. Consequently, a substantial part of the acts, events or omissions giving rise to the claim occurred in this District, and a substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws alleged herein was and is carried out within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District. Retail Locations for AmeriGas propane exchange tanks are listed here:  http://www.amerigas.com/find-amerigas-propane-locations/ and locations for Ferrellgas/Blue Rhino propane exchange tanks are listed here: http://www.bluerhino.com/Tank-Exchange/Find-a-Rhino-Location.aspx.

11.     Jurisdiction over the defendants comports with the United States Constitution and with 15 U.S.C. §§ 22 and 26.

### III.     THE PARTIES

12.     Plaintiff, SEAN VENEZIA, is a resident of Danville, Contra Costa County,

California, and purchased during the violation period propane in exchange tanks from one or more retailers in the Northern District of California supplied by one or both defendants.

13.     Plaintiff, MICHAEL S. HARVEY, is a resident of St. Peters, Missouri, and purchased propane in exchange tanks from a retailer supplied by one or both defendants during the violation period.

14.     Plaintiff, GREGORY LUDVIGSEN, is a resident of St. Paul, Minnesota and purchased propane in exchange tanks from a retailer supplied by one or both defendants during the violation period.

15.     Plaintiff, ARTHUR HULL, is a resident of Albuquerque, New Mexico and purchased propane in exchange tanks from a retailer supplied by one or both defendants during the violation period.

16.     Plaintiff, ALAN ROCKWELL, is a resident of Shady Side, Maryland and purchased propane in propane exchange tanks from a retailer supplied by one or both of the defendants during the violation period.

17.     Defendant, FERRELLGAS PARTNERS, L.P., is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. It maintains a nearly complete interest in and conducts its business activities primarily through defendant, FERRELLGAS, L.P.

18.     Defendant, FERRELLGAS, L.P., d/b/a Blue Rhino, is a limited partnership organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. FERRELLGAS, L.P. operates a national propane distribution business and owns or has access to distribution locations nationwide and is authorized to do business in

California and is engaged in the preparing, filling, distributing, marketing, and/or sale of propane exchange tanks in California. Its business includes the filling, refilling, refurbishing, sale and distribution of propane exchange tanks under the Blue Rhino name. Blue Rhino's propane is sold to consumers at more than 43,000 retail locations nationwide through its exchange tank service.

19.    Defendant AMERIGAS PARTNERS, L.P., is a publicly traded master limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania 19406. AMERIGAS PARTNERS, L.P., operates a national propane distribution business through its subsidiary, AMERIGAS PROPANE, L.P.

20.    Defendant, AMERIGAS PROPANE, L.P., is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania 19406. AMERIGAS PROPANE, L.P., a wholly-owned and -controlled subsidiary of AMERIGAS PARTNERS, L.P., is authorized to do business in California and is engaged in the marketing and sale of propane and propane supply related services, including the distribution and supply of bulk propane to residential, commercial, and agricultural customers and the preparing, filling, distributing, marketing, and sale of propane exchange tanks. AMERIGAS PROPANE, L.P. often does business as AmeriGas Cylinder Exchange when preparing distributing, marketing, or selling propane in propane exchange tanks.

21.    Defendant, AMERIGAS PROPANE, INC., is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Pennsylvania, with its office and principal place of business located at 460 North Gulph Road, King of

Prussia, Pennsylvania 19406. AMERIGAS PROPANE, INC. is authorized to do business in California and is the General Partner of AMERIGAS PARTNERS, L.P.

## IV. TRADE AND INTERSTATE COMMERCE

22. Propane is a colorless gas used for numerous industrial and household purposes. Propane exchange tanks used in the United States are highly standardized, consisting of a standardized tank and a standardized valve system. Propane exchange tanks have a maximum physical capacity of 25 pounds, but safety regulations forbid filling such tanks beyond 80 percent of their physical capacity, *i.e.*, 20 pounds. Beginning in 2002, the National Fire Protection Association modified its standards to require that propane exchange tanks be equipped with an overfilling protection device ("OPD"). Thereafter, industry and market custom was to fill propane exchange tanks with 17 pounds of propane.

23. Propane and propane exchange tanks are available to consumers at tens of thousands of retailers nationwide. At its option, a consumer may obtain a propane-filled tank by (a) purchasing a prefilled tank while exchanging their empty tank, paying thereby only for the propane contents of the tank; or (b) purchasing a prefilled tank while paying an additional fee for the tank in lieu of exchanging an empty tank.

24. Propane exchange tanks in the United States are fungible and functionally interchangeable. Defendants, defendants' competitors, and retailers who deal in propane exchange tanks treat them as such. Consumers can exchange any propane exchange tank at any store that carries propane exchange tanks without regard for which company supplied the tank to be exchanged.

25. To enable the interchangeability of propane exchange tanks, defendants cooperate with one another with respect to the cleaning, refurbishing, repainting, and refilling of a portion of each firm's tank inventory. Starting in about 2006, AmeriGas

arranged for Blue Rhino to refurbish and fill propane tanks for it in Florida and entered into an agreement, sometimes called a "co-packing agreement," to govern that arrangement. The companies have since entered into several co-packing agreements of that kind. As of mid-2014, Blue Rhino processes about 10% of AmeriGas's volume of propane exchange tanks. Blue Rhino refurbishes and/or refills exchange tanks for AmeriGas at Blue Rhino facilities in Florida, Colorado, Washington and Missouri. Similarly, AmeriGas processes a comparable proportion of Blue Rhino's volume of propane exchange tanks, refurbishing and/or refilling exchange tanks for Blue Rhino at AmeriGas facilities in California and New Hampshire.

26. Defendants' propane exchange tanks are sold and used in the flow of interstate commerce and involve a substantial dollar amount of commerce nationwide.

## V. THE RELEVANT MARKETS

27. This case involves two relevant product markets for propane exchange tanks on different levels of distribution. In the wholesale market for propane exchange tanks, tens of thousands of retailers purchase propane exchange tanks from wholesalers, such as defendants. In the retail market for propane exchange tanks, millions of consumers, such as plaintiffs and the members of the proposed class, purchase propane exchange tanks from retailers.

28. At all times material hereto, defendants were the two largest wholesale suppliers of propane in propane exchange tanks in the United States, of which Blue Rhino's market share is approximately 50 percent while AmeriGas' market share is approximately 35 percent. The remaining 15 percent is shared by local and regional suppliers, of which none has more than nine percent of the market.

29. Walmart is the largest propane exchange tank retailer in the United States and therefore the largest wholesale purchaser of propane exchange tanks. The next largest

retailers are Lowe's Home Improvement Stores and The Home Depot. Blue Rhino's largest customer is Lowe's and its second largest is Walmart. Walmart purchases approximately 60% its propane exchange tank requirements from Blue Rhino, another large proportion of its wholesale requirements for propane exchange tanks from AmeriGas, which serves about half of the volume sold to Walmart by Blue Rhino, and a regional wholesaler, Ozark Propane Company, supplies Walmart locations in Arkansas and Oklahoma. AmeriGas's largest customer is The Home Depot.

30.     Aside from defendants, no other wholesaler of propane exchange tanks has the capacity or resources to supply the requirements of a large retailer such as Walmart, Lowe's, or Home Depot.

31.     There is no reasonable or cost-effective substitute or alternative to propane exchange tanks available in the wholesale market. Accordingly, a sufficient number of retailers would not switch away from propane exchange tanks to make a small but significant, non-transitory price increase in that market unprofitable. The wholesale market for propane exchange tanks is a relevant antitrust product market.

32.     In the retail market, where consumers such as plaintiffs and the proposed class purchase propane exchange tanks from retailers, the largest of these include Walmart, Lowe's, and Home Depot. However, propane exchange tanks are available at tens of thousands of other retailers, large and small, nationwide.

33.     There is no reasonable or cost-effective substitute or alternative to propane exchange tanks sold in the retail market. Accordingly, a sufficient number of consumers would not switch away from propane exchange tanks to make a small but significant, non-transitory price increase in that market unprofitable. The retail market for propane exchange tanks is a relevant antitrust product market.

34. The relevant geographic market definition for both the retail and wholesale product markets is the United States.

## V. ANTICOMPETITIVE CONCERTED CONDUCT

35. Pursuant to their co-packing agreements, defendants could, and did, exchange competitively sensitive information on an ongoing basis. Some of these exchanges included material, competitively sensitive information, the exchanges of which had the purpose, tendency, and capacity to facilitate price coordination among the defendants.

36. In or around January 2008, Defendant AmeriGas considered a proposal to reduce the amount of propane in its exchange tanks to about 16 pounds with no corresponding price change, resulting in an increase in the wholesale price of propane in exchange tanks and an increase AmeriGas' profit margins. However, AmeriGas did not immediately pursue its fill-reduction plan at that time. Among the reasons that AmeriGas did not unilaterally act was that the firm would be competitively disadvantaged if other companies in the industry, particularly Blue Rhino, did not also reduce the fill level in their propane exchange tanks, *i.e.*, also implement a wholesale price increase. The proposal was temporarily shelved.

37. In April 2008, Blue Rhino management approved a proposal to reduce the amount of propane in its exchange tanks from 17 pounds to 15 pounds of propane, without a corresponding price reduction. Blue Rhino did attempt to implement its fill reduction plan at that time, but was unable to do so.

38. Blue Rhino was particularly concerned about its competitive standing with its second largest customer, Walmart, because Walmart purchased propane in propane exchange tanks from both Blue Rhino and AmeriGas.

39. The Blue Rhino Director of Strategic Accounts responsible for the Walmart

account reported to his manager that the fill reduction could put Blue Rhino at a competitive disadvantage in relation to AmeriGas, stating, "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark. We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to take states. . . . Then, we need to pray that [AmeriGas] takes a similar move as soon as possible. If [AmeriGas] doesn't move, we will have a BIG issue." He elaborated: "The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move."

      40.     On or about April 22, 2008, Blue Rhino decided to inform Walmart of its fill reduction plan.

      41.     On or about April 28, 2008, Blue Rhino's Director of Strategic Accounts met with the Walmart buyer to discuss its intention to reduce the fill in its propane exchange tanks. Walmart rejected the proposed fill reduction, telling the Blue Rhino Director of Strategic Accounts that the fill reduction was a price increase to which Walmart would not agree. He also told Blue Rhino's Director of Strategic Accounts that Walmart did not want to carry propane exchange tanks with different fill levels—that is, tanks at 15 pounds in stores serviced by Blue Rhino and tanks at 17 pounds in stores serviced by AmeriGas and Ozark.

      42.     On or about April 29, 2008, a senior Blue Rhino manager ordered production managers to "stand down" implementation of the fill reduction.

      43.     On or about May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, Blue Rhino's largest retail customer. Lowe's recognized, however, that selling propane exchange tanks with 15-pound fills would place it at a competitive disadvantage as compared to retailers able to sell the tanks at 17-pound fills. Accordingly, approximately two weeks

later, Lowe's agreed to accept 15- pound exchange tanks on the condition that Blue Rhino convert all of its customers, including Walmart, to 15-pound tanks of propane within 30 days.

44.     Prior to June 2008, Blue Rhino had informed AmeriGas that it was going to reduce the fill level in its exchange tanks from 17 to 15 pounds  On June 18, 2008 and June 19, 2008, Blue Rhino's President and AmeriGas's Director of National Accounts called each other seven times.

45.     On June 20, 2008, AmeriGas management produced a budget that reviewed the possibility of reducing the level of AmeriGas's exchange tanks from 17 to 15 pounds.

46.     Also on June 20, 2008, Blue Rhino account executives discussed the fill reduction again with Walmart. Following the last of these calls, Blue Rhino's President reported, "I've continued to have a lot of inquiries from [AmeriGas] regarding the lower fuel fill due to their need to adjust production. I've been told that it would be very challenging to produce two different size products long-term ... once again, messaging that they'll follow closely behind us in the market."

47.     Also on June 20, 2008, AmeriGas management produced a draft budget with a plan for reducing the fill level of AmeriGas's exchange tanks from 17 to 15 pounds. After learning of Blue Rhino's plan to reduce the fill level of its exchange tanks, AmeriGas determined to reduce the fill level in its propane exchange tanks. AmeriGas's decision to reduce propane exchange tank fill levels was based in part on its common understanding with Blue Rhino that Blue Rhino would also be reduce its propane exchange tank fill levels.

48.     Each defendant implemented its fill reduction/price increase in reliance on a common understanding that both defendants would do so. Each defendant implemented its fill reduction/price increase based in part on assurances exchanged with the other defendant

that each would implement the fill reduction/price increase. Neither defendant unilaterally could implement the fill reduction/price increase in the absence of such a common understanding and/or mutual assurances.

49.     On or about June 25, 2008, Todd Brown, President of Blue Rhino and Senior Vice President of Sales and Marketing for Ferrellgas, Inc., called AmeriGas's president of sales and marketing to discuss the fill reduction again. Also on June 25, 2008, Blue Rhino began notifying its other customers (aside from Walmart and Lowe's) of its plans to reduce the fill level in its propane exchange tanks effective July 21, 2008.

50.     On or about June 26, 2008, Jay Werner of Blue Rhino and an AmeriGas employee discussed operational changes needed to implement the fill reduction. Representatives from the two companies also discussed the timing of the first distribution of under-filled propane exchange tanks to their customers.

51.     Through communications and coordination that occurred over the course of the final 10 days of June 2008, Blue Rhino and AmeriGas reached an agreement and understanding regarding the fill reduction/price increase plan. Blue Rhino would begin selling tanks with only 15 pounds of propane on July 21, 2008. AmeriGas would do the same on August 1, 2008.

52.     Beginning on or about July 10, 2008, Blue Rhino and AmeriGas cooperated and coordinated by engaging in a concerted effort to get Walmart to accept the fill reduction/price increase. These concerted efforts continued until about October 10, 2008, when Walmart capitulated and accepted the fill reduction/price increase from its two principal wholesale suppliers, Blue Rhino and AmeriGas.

53.     Defendants' concerted efforts to gain Walmart's acceptance of the fill reduction/price increase included a July 10, 2008 email from AmeriGas's Director of

National Accounts to Walmart's buyer informing him that "the cylinder exchange industry is planning a move to a standard weight of propane in a tank from 17 lbs. net to 15 lbs. net." AmeriGas based its representation regarding an "industry" plan to move to reduced fill levels in part on a common understanding with Blue Rhino and mutual assurances exchanged with Blue Rhino.

54.     Nonetheless, the market viability of the concerted fill reduction/price increase depended on capitulation by Walmart, which continued to object. A rejection by Walmart of the fill reduction/price increase would cause other major retailers also to reject the fill reduction/price increase on the grounds that they would be at a competitive disadvantage if the propane exchange tanks they sold contained less fuel than otherwise identical propane exchange tanks available at Walmart.

55.     One retailer that resisted the fill reduction/price increase was Lowe's, Blue Rhino's largest customer. Lowe's agreed to accept the fill reduction only on the express condition that all Blue Rhino customers would also be forced to purchase 15-pound tanks within 30 days of Lowe's acceptance of the price increase.

56.     Sales executives from the two defendants communicated repeatedly by telephone and email in furtherance of their concerted efforts to achieve Walmart's acceptance of the fill reduction/price increase. They encouraged each other to stay loyal to their cartel and refuse to compete.

57.     On or about July 11, 2008, Blue Rhino's Vice President of Sales called AmeriGas's Director of National Accounts. The two sales executives spoke at length by telephone. Internal Blue Rhino documents confirm that AmeriGas and Blue Rhino sales executives discussed Walmart's rejection of AmeriGas's proposal to begin shipping 15-pound exchange tanks.

Class Action Complaint, *Venezia v. Ferrellgas Partners, L.P. et al.*, July 10, 2014, Page 14

58.     On July 15, 2008, AmeriGas described the change in the propane tank exchange program to its employees in a Memorandum, as follows: "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers are transitioning to a 15 pound cylinder. This slight decrease from current 17 pound levels will quickly become the industry standard . . . .*" (Emphasis added.)

59.     In announcing the change to its production team, AmeriGas stated: "The cylinders will be filled with 3.5 gallons of propane versus the current 4 gallons. . . . *The major competitors in cylinder exchange will also be moving to a 15 pound cylinder* and as a result, it will become the industry standard." (Emphasis added.) The "other national providers" and "major competitors" in the propane exchange industry referred to by AmeriGas include primarily, if not solely, Blue Rhino.

60.     On or about July 21 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke at length by telephone. Documents from Blue Rhino confirm that the AmeriGas and Blue Rhino sales executives discussed AmeriGas's plans for responding to Walmart's refusal to accept the fill reduction/price increase.

61.     On or about August 11, 2008, AmeriGas's Director of National Accounts, who was responsible for dealing with Walmart, called Blue Rhino's Vice President of Sales and told him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

62.     On or about August 13, 2008, the Blue Rhino sales executives discussed plans to implore AmeriGas to ensure that Home Depot, AmeriGas's largest retail customer, also accepted the fill reduction/price increase. The executives reasoned that Walmart would be

more likely to accept the fill reduction/price increase if it knew that The Home Depot had already done so.

63. On August 21, 2008, Blue Rhino and AmeriGas sales executives spoke several times by telephone. Shortly after these communications, an AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to ensure that the Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

64. On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone. They discussed the status of their respective efforts to convert their customers to 15-pound tanks, as well as the current retail pricing of tanks at Lowe's.

65. On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again spoke by telephone. They discussed the status of their negotiations with Walmart. Expressing frustration at Walmart's intransigence, AmeriGas's Director of National Accounts suggested that it was time to issue an ultimatum to Walmart. Blue Rhino's Vice President of Sales responded by telling him that Blue Rhino was continuing to work with Walmart and that AmeriGas should "hang in there."

66. On September 15 and 22, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts again communicated by telephone.

67. On September 30, 2008, AmeriGas's Director of National Accounts emailed Blue Rhino's Vice President of Sales and informed him that Walmart management was meeting the following day to discuss the proposed fill reduction/price increase.

68. On October 6, 2008, the Lowe's buyer emailed his Blue Rhino sales executive with an ultimatum. Lowe's had agreed to accept 15-pound tanks on the condition that all

other Blue Rhino customers would be converted within 30 days. Lowe's observed that Walmart was still selling 17-pound tanks and did not have to pay the price increase, disadvantaging Lowe's. The Lowe's buyer demanded that Blue Rhino fill Lowe's tanks with 17 pounds of propane so long as Blue Rhino did so for any of its other customers.

69.     The Lowe's demand reconfirmed to Blue Rhino that it needed Walmart to immediately accept the fill reduction or risk the fill reduction/price increase unraveling. It also highlighted the need for Blue Rhino and AmeriGas to continue to push Walmart to accept the fill reduction.

70.     On October 6, 2008, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to finalize Walmart's acceptance of the fill reduction that day. Within a half hour, the Blue Rhino Vice President of Sales called his counterpart at AmeriGas. The two talked for 16 minutes.

71.     Following his 16-minute conversation with the AmeriGas Director of National Accounts, the Blue Rhino Vice President of Sales emailed Walmart to demand that it accept the fill reduction/price increase.

72.     Early the following morning, the AmeriGas Director of National Accounts emailed Walmart urging it to implement the fill reduction.

73.     On October 10, 2008, believing it had no alternative but to accept the fill reduction, Walmart acquiesced to defendants' concerted demands and agreed to accept propane exchange tanks filled to 15 pounds from both Blue Rhino and AmeriGas.

## VI.     *PER SE* VIOLATION OF SECTION ONE OF THE SHERMAN ACT

74.     The secret agreement, common understanding, coordination, and mutual assurances between Blue Rhino and AmeriGas regarding the fill reduction/price increase in the wholesale market for propane exchange tanks, and, when faced with resistance from

Walmart, their combined, coordinated, and concerted efforts to achieve Walmart's acquiescence to the fill reduction/price increase, constituted an agreement, common understanding, and concerted action in restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act and analogous state enactments. The agreement raised the price per pound of propane in the wholesale market for propane exchange tanks to Walmart and to all other retailers above the competitive level and above what it would have been in the absence of the restraining agreement, understanding and conduct.

75.     The acts and practices of defendants, as alleged herein, had and have the purpose, capacity, tendency, and effect of restricting or eliminating competition in the wholesale market for propane exchange tanks. Absent their unlawful agreement, defendants would not have been able profitably to reduce the fill levels of their tanks to 15 pounds.

76.     Defendants' conspiracy has continued until the present and remains ongoing. Both defendants continue to maintain the reduced fill levels despite the fact that propane prices have decreased substantially from their high in 2008.

## VII.     INJURY TO PLAINTIFFS AND THE CLASS MEMBERS

77.     As a result of defendants' conspiracy, plaintiff and the members of the proposed class paid more and continue to pay a higher price per pound for propane in propane exchange tanks than they would have paid in a competitive market or in the absence of the anticompetitive common understanding between defendants regarding the fill reduction/price increase.

78.     Plaintiffs and members of the proposed class purchased defendants' propane exchange tanks from retailers during the class period, and were injured as a direct and foreseeable consequence of defendants' unlawful concerted action. To maintain margins, retailers did not reduce the price of propane exchange tanks despite the fill reduction.

Accordingly, retail consumers—indirect purchasers such as plaintiffs and the members of the proposed class—have borne and continue to bear the entire collusive overcharge of 13%, because retailers have fully passed on the unlawful overcharge to their customers.

## VIII.   CLASS ALLEGATIONS

79.   Plaintiffs bring this action under Fed. R. Civ. P., 23(a), (b)(I)(A), (2) and (3), on behalf of themselves and the following class of indirect purchasers:

> All individuals and entities that purchased or exchanged with a retailer in the United States any 25-pound capacity propane exchange tank for their own use from any time on or after August, 2008, to the present ("indirect purchasers"). Excluded from the proposed class are defendants, any entity in which defendants have a controlling interest, defendants' legal representatives, predecessors, successors, assigns, and employees, and any governmental entity.

80.   Subject to additional information obtained through further investigation and discovery, the foregoing class definition may be expanded or narrowed by amendment or amended complaint.

81.   This action has been brought and may properly be maintained as a class action, pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the class:

a.   <u>Numerosity</u>: Members of the class are so numerous that their individual joinder is impracticable. Plaintiffs estimate that defendants have sold and distributed millions of propane cylinders since October of 2008 which were purchased or exchanged by millions of consumers from various retail outlets in every state in the United States. The precise number of class members is unknown to plaintiff. Plaintiffs believe that many, if not most, of the class members can be identified from records maintained by defendants' retailers.

b.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common

questions of fact and law exist as to all members of the proposed class. These questions predominate over the questions affecting individual class members, and include:

    i.   Whether defendants combined and conspired to fix the wholesale price of propane exchange tanks;

    ii.   Whether defendants engaged in concerted efforts to implement the fill reduction/price increase in furtherance of a common understanding or agreement;

    iii.   Whether defendants' common understanding, agreement, or exchange of mutual assurances violates Section 1 of the Sherman Act, analogous state enactments, unfair competition, and consumer protection laws of the states as alleged below;

    iv.   The operative time period of defendants' combination or conspiracy;

    v.   Whether defendants' conduct caused antitrust injury to plaintiffs and the members of the class;

    vi.   The appropriate measure of damages suffered by the class; and,

    vii.   The appropriate nature of class-wide equitable relief.

c.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the class because plaintiffs directly incurred a supra-competitive price for propane exchange tanks, as did each member of the class. Furthermore, plaintiffs and all members of the class sustained monetary injury in an identical and easily computable magnitude arising out of defendants' wrongful conduct.

d.   <u>Adequacy</u>:  Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the class that they seek to represent;

they have retained counsel competent and highly experienced in complex class action litigation; and they intend to prosecute this action vigorously. The interests of the class will be fairly and adequately represented by plaintiffs and their counsel.

e. <u>Superiority</u>: A class action is superior to other available means of fair and efficient adjudication of the claims of plaintiff and members of the class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by defendants' conduct. It would virtually be impossible for individual members of the class effectively to redress the wrongs done to them. Even if the members of the class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties and to the court system due to the relatively complex legal and factual issues presented by the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

82.    The anticompetitive conduct of defendants alleged herein has imposed a common antitrust injury on the members of the class.

83.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole.

# IX.    FRAUDULENT CONCEALMENT

84.    Defendants concealed from plaintiffs, members of the class, and the public their agreement and common understanding regarding the fill reduction/price increase in the wholesale market for propane exchange tanks and concealed its true purpose. Among other things, in announcing the price change, defendants adopted the pretext of an "industry standard" to implement the fill reduction, when in fact the fill reductions were the product of unlawful collusion and price fixing between Blue Rhino and AmeriGas, competitors and rivals.

85.    Defendants' concealment prevented plaintiff from discovering the instant cause of action until on or about March 27, 2014, when the FTC issued an administrative complaint against defendants alleging that they colluded in 2008 to persuade their retail customers to accept the tank fill reduction from 17 pounds to 15 pounds 2011, despite plaintiffs' exercise of due diligence prior to that time.

86.    Plaintiffs were placed on actual notice of this cause of action on or about March 27, 2014. Plaintiffs did not know and through the exercise of diligence could not have known of the anticompetitive conduct alleged herein, because of defendants' concealment of their conspiracy in non-public and confidential email exchanges and telephone calls. Defendants actively misled retailers, for example, by giving Walmart pretextual reasons for the fill reduction/price increase, such as technical complications with 17 pound fill levels. Defendants concealed from plaintiffs and the class their secret phone and email conversations in which they: (1) agreed to decrease the fill level in concert, and (2) agreed to act in concert to overcome customer resistance. Defendants also concealed that they secretly and repeatedly verified with one another that each co-conspirator was adhering to the common understanding regarding the fill reduction/price increase. The administrative

complaint detailed phone calls and documents evidencing these unlawful acts was concealed by defendants from their customers and the public. Plaintiffs and the class did not and could not have discovered defendants' collusion until after March 27, 2014, when excerpts from these documents and summaries of these phone calls entered the public record.

87.     Accordingly, the statute of limitations was tolled during the time that defendants fraudulently concealed the antitrust violation that forms the basis of this action and the claims asserted by plaintiffs and the class.

88.     Defendants' unlawful conduct and fraudulent concealment thereof constitutes a separate transaction and occurrence and a distinct and separate legal violation from the subject matter of earlier litigation, including but not limited to *In Re: Pre-Filled Propane Tank Marketing and Sales Practices Litigation*, U.S. District Court, Western District of Missouri (Kansas City), 4:09-md-02086-GAF (Doc. 114-1). Accordingly, said litigation has no collateral or other legal effect on the claims prosecuted by plaintiffs herein. Defendants' conspiracy and their concealment thereof continued while said litigation was pending and thereafter and, due to defendants' concealment, was not and could not have been discovered until March 27, 2014.

## X.     VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF

#### (For injunctive relief under Section 16 of the Clayton Act for Defendants' Violation of Section 1 of the Sherman Act)

89.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

90.     Beginning at a time presently unknown to plaintiffs, but at least as early as June 18, 2008, the exact dates being unknown to plaintiff, defendants entered into a

continuing agreement, understanding, and conspiracy in restraint of trade artificially to raise, fix, maintain, and/or stabilize the wholesale price of, and artificially to lower, maintain, and stabilize the contents of, propane exchange tanks in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

91. The alleged acts, agreements, combinations and/or conspiracies have caused artificially high prices to be paid by consumers who are members of the class. Plaintiffs and the class have suffered damages and face a threatened loss in violation of antitrust law if injunctive relief is not obtained.

92. To ensure plaintiffs and the class are no longer harmed in the future by the misconduct alleged herein, plaintiffs seek an injunction against defendants, preventing and restraining the violations alleged herein. The equitable relief outlined below is necessary to deter future antitrust violations, redress plaintiffs' and class members' injuries, and restore competition to the wholesale and retail propane exchange tank markets.

93. Plaintiffs have engaged the undersigned counsel and have agreed to pay a reasonable attorneys' fee for its services.

## SECOND CLAIM FOR RELIEF

### (Violation of State Antitrust and Unfair Competition Laws)

94. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

95. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. § 44-1401 *et seq.*

96. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code § 16700 *et seq*. and Cal. Bus. & Prof. Code § 17200 *et seq*.

Class Action Complaint, *Venezia v. Ferrellgas Partners, L.P. et al.*, July 10, 2014, Page 24

97. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. § 28-4502 *et seq.*

98. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*

99. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1 *et seq.*

100. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. § 50-101 *et seq.*

101. Defendants have engaged in unfair competition or deceptive acts or practices in violation of Maine Rev. Stat. tit. 10, § 1101*et seq.*

102. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. § 445.772 *et seq.*

103. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. § 325D.51 *et seq.*

104. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

105. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. § 59-801 *et seq.*

106. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A *et seq.*

107. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1 *et seq.*

108. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New York Gen. Bus. Law § 340 *et seq.*

109.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. § 75-1 *et seq*.

110.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01 *et seq*.

111.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

112.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Pennsylvania common law.

113.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1 *et seq*.

114.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. § 47-25-101 *et seq*.

115.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Utah Code § 76-10-3109 *et seq*.

116.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453 *et seq*.

117.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia Code § 47-18-1 *et seq*.

118.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. § 133.01 *et seq*.

119.    As alleged herein, as a direct result of the conduct of Defendants, plaintiffs and the members of the class have been injured in their businesses and property as a result of defendants' unlawful conduct, for which they seek damages.

120.    As a direct and proximate result of Defendants' unlawful conduct, plaintiffs

and other members of the class have been injured in that they paid more, per pound, to directly purchase the propane in propane exchange tanks than they otherwise would have paid in the absence of defendants' illegal fill reduction/price increase agreement and concerted conduct. As a proximate result of defendants' conduct, plaintiffs and the members of the class have been damaged in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Violation of State Consumer Protection and Unfair Competition Laws)

121.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

122.    By reason of the foregoing, defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

123.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Arkansas Code § 4-88-101 *et seq*.

124.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 *et seq*.

125.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of District of Columbia Code Ann. § 28-3901 *et seq*.

126.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq*.

127.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*.

128.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of Kansas Stat. § 50-623 *et seq*.

129.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, § 1, *et seq.*

130.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Montana Code § 30-14-101 *et seq.*

131.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Nebraska Rev. Stat. § 59-1601 *et seq.*

132.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of New Hampshire Rev. Stat. Ann. § 358-A:1, *et seq.*

133.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*

134.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 *et seq.*

135.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.*

136.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Oregon Rev. Stat. § 646.605 *et seq.*

137.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Rhode Island Gen. Laws § 6-13.1-1 *et seq.*

138.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of South Carolina Code Laws § 39-5-10 *et seq.*

139.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Utah Code § 13-11-1 *et seq.*

140.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2453 *et seq.*

141.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of West Virginia Code § 46A-6-101 *et seq.*

142.     Defendants have engaged in unfair competition or deceptive acts or practices in violation of Wyoming Stat. § 40-12-105 *et seq.*

143.     Plaintiffs and the members of the class in the states listed above paid supra-competitive, artificially high prices for propane exchange tanks and have been thereby injured in their businesses and property as a result of defendants' unlawful conduct, for which they seek damages.

144.     As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and other members of the class have been injured in that they paid more, per pound, to directly purchase the propane in propane exchange tanks than they otherwise would have paid in the absence of defendants' illegal fill reduction/price increase agreement and concerted conduct. As a proximate result of defendants' conduct, plaintiffs and the members of the class have been damaged in an amount to be proven at trial.

## XI.     PRAYER FOR RELIEF

WHEREFORE, on behalf of themselves and members of the class, as applicable, plaintiffs prays:

A.     That the court determine that the Sherman Act, state antitrust law, and state consumer protection and/or unfair competition law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

a.     A restraint of trade or commerce in violation of Section 1 of the Sherman

Act, as alleged in the First Claim for Relief;

b.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified herein; and,

c.   Violations of the state consumer protection and unfair competition laws identified herein.

C.     That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged here, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     That plaintiffs and the class recover damages, as provided by federal and state antitrust laws, and that a joint and several judgment in favor of plaintiffs and the class be entered against the defendants in an amount to be trebled in accordance with such laws;

E.     That plaintiffs be awarded restitution, including disgorgement of profits obtained by defendants as a result of their acts of unfair competition;

F.     That plaintiffs and the members of the class be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.     That plaintiffs and the members of the class recover their costs of this suit,

including reasonable attorneys' fees as provided by law; and,

H.   That plaintiffs and members of the class have such other, further, and different

relief as the case may require and the court may deem just and proper under

the circumstances.

## XII.   JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the members of the class, and pursuant to

Federal Rule of Civil Procedure 38(b), hereby demand a trial by jury on all issues so triable.


DATED:      July 10, 2014

                                        LUKAS, NACE, GUTIERREZ & SACHS, LLP
                                        Brooks E. Harlow, Esq.
                                        8300 Greensboro Drive, Suite 1200
                                        McLean, VA  22101
                                        Tel: (703) 584-8678
                                        Fax:  (703) 584-8694
                                        bharlow@fcclaw.com


                                        By: _____

                                        *Attorneys for Plaintiffs*, SEAN VENEZIA,
                                        MICHAEL S. HARVEY, GREGORY
                                        LUDVIGSEN, ARTHUR HULL, and ALAN
                                        ROCKWELL